Filed 12/19/25; Certified for Publication 12/22/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARTIN ENG, et al., <br>     Plaintiffs, <br> v. <br> CRAIG OPPERMAN, et al. <br>     Defendants, Cross- <br>     Complainants, and Appellants; <br><br> PORTOLA RANCH ASSOCIATION, INC., <br>     Cross-defendant and <br>     Respondent. | A170737, A171745 <br><br> (San Mateo County <br> Super. Ct. No. 21CIV06544) |

    Craig and Michelle Opperman (when referred to collectively, the Oppermans) applied to their homeowner's association to construct an accessory dwelling unit (ADU) on their property. The Portola Valley Ranch Association's (Association) design review committee indicated it had no expertise on ADUs, and "formally referred" the application to its Board of Directors. The Board considered the application, and in a comprehensive letter citing concerns about traffic safety and fire safety denied it.

    In a litigation brought by third parties involving their property, the Oppermans filed a cross-complaint that included the Association as a cross-

defendant, alleging against it causes of action for breach of governing documents, breach of fiduciary duty, interference with business expectation, and declaratory relief. The Association moved for summary judgment on the cross-complaint, which the trial court granted, and entered a judgment and an amended judgment for the Association.

The Oppermans appeal, asserting four arguments, some of which overlap: (1) the Association CC&Rs limit the project review to aesthetics, which the Board did not rely on; (2) the Association is not protected by the rule in *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249; (3) the Association failed to present evidence that would require a jury to find it had acted in good faith; and (4) the Association's evidence fails to sustain its burden. We conclude that none of the arguments has merit, and we affirm.

## BACKGROUND

### The General Setting

The Portola Valley Ranch Planned Development (Development) is a planned development comprised of single family homes surrounded by trees and natural vegetation, organized pursuant to Civil Code section 4175. The Development is managed by the Portola Ranch Association, whose "Governing Documents" include the covenants, conditions, and restrictions (CC&Rs), the Articles, the Bylaws, and the Operating Rules of the Association, the last of which "apply generally to the management and operations of the Development or the conduct of the business and affairs of the Association and the Owners." These rules include that "The affairs of the Association shall be conducted in accordance with the Governing Documents and applicable laws. The Owners of all the Lots covenant and agree that the administration of the Development shall be in accordance with the provisions

2

of this Declaration, the Act, the Nonprofit Corporation Law and the Articles, Bylaws and Operating Rules of the Association." Specific provisions of the governing documents are relevant to issues discussed below, and will be set forth in connection with the issue to which they pertain.

The residents in the Development include the Oppermans, who live at 10 Sandstone Street, a property they acquired in 2017. The adjacent property, at 8 Sandstone Street, is owned by Martin and Anna Eng, who acquired it a year earlier. In mid-September 2021, the Oppermans announced they intended to create an ADU on their property, and on September 27 Michelle Opperman sent to the Design Review Committee of the Association a preliminary plan for an ADU on their lot that proposed to convert "the existing detached double garage at 10 Sandstone Street into an ADU while moving the existing double garage forward up to the lot's front building envelope line." The new garage was to be within the property's "building envelope" on the existing driveway, positioned between the ADU and the adjacent common-area private street.

On September 29, the Design Committee sent to the Association's Board of Directors (Board) a memorandum indicating that the Design Committee lacked any guidance on how to review an ADU application. The memorandum concluded that the Design Review Committee was unprepared to review an ADU application, declined to review any ADU application until appropriate guidelines were approved by the Board, and "formally referred" all ADU applications to the Board for review and action.

On October 15, the Oppermans submitted their formal application to convert the garage to an ADU.

At the October 20 Board meeting, the Board agreed to review the application, and thereafter began to investigate issues that might be

presented by the Oppermans' application.  Among other things, the Board retained an independent consultant, architect Bill Maston, to review the application and assist in the investigation.  Maston conducted a review and analysis of the application and concluded it was incomplete and deficient.

Following Maston's review, the Oppermans were twice asked to separate the ADU application and the new garage application into two separate applications.  Twice they refused.

As discussed below, on December 10, before any decision on the Oppermans' application, the Engs filed a complaint against the Oppermans to quiet title, alleging that the Engs had a non-exclusive easement for egress from their property onto the street that burdens the portion of the Oppermans' property that sits in front of their garage.

On December 13, the Board met in open session to consider and vote on the Oppermans' application.  The Oppermans were present during the Board's discussion of the application and members were given an opportunity to make comments.  All Board members—except Craig Opperman who recused himself—voted against the application as submitted.

By letter of December 17, signed by Jon L. Keller, "Association President on behalf of the Board of Directors," the Board notified the Oppermans of that denial.  Mr. Keller's letter began as follows:

"Please be advised that your proposal for an ADU and garage has been denied as submitted.

"While the board is acting in the Design Committee's stead with respect to the review of ADU applications, the board has additional responsibilities as outlined in the CC&Rs that include looking after the health and safety of all homeowners.  It is the intent of the board to espouse these values and act in the interest of the community while being in compliance with new ADU

4

legislation.

"In this case, the board felt that it could not approve your application as submitted due to concerns about traffic and fire safety associated with the proposed new garage in your application. These concerns are expanded upon below[.]"

The letter went on to set forth in bullet-point fashion "[c]oncerns about traffic safety" (with three bullet point items); "[c]oncerns about fire safety" (with three bullet point items); and "[t]he Garage is not part of the ADU" (with four bullet point items). (Boldface and underline omitted.) And the letter ended with this: "It's the board's conclusion that the above fire and traffic safety concerns dictate that your application be denied. If you have any questions about any of this, please do not hesitate to reach out."

**The Proceedings Below**

As noted, in December, the Engs had filed a complaint against the Oppermans to quiet title, claiming that the Engs had a non-exclusive easement for purposes of egress from their property that burdens a portion of the Opperman property.

In May 2022, the Oppermans filed their answer to the Engs' complaint, and four months later the pleading leading to this appeal—a cross-complaint. The caption of the cross-complaint named the Engs and "All persons unknown claiming any legal or equitable right" to the property, but did not name the Association. However, next to the caption the cross-complaint stated this: "Cross-Complaint Against Martin Eng, Anna Eng, Portola Ranch Association And ROES 1-20 For: [1.] Breach of Governing Documents[;] [¶] [2]. Breach of Fiduciary Duty Against the Portola Ranch Association; [¶] [3.] Breach of Fiduciary Duty Against Individual ROES 1-20; [¶] [4.] Tortious Interference With Business Expectancy; [¶] [5.] Declaratory Relief[;] And [¶]

5

[6.] Injunctive Relief." (Capitalization and boldface omitted.)

The essence of the cross-complaint is best told by its 10-paragraph "Overview," from which we quote some portions. Thus:

"7. This cross-action results from the Ranch Board refusing to allow the Oppermans' application for the addition of an [ADU] . . . to improve their property. The Oppermans allege that the Engs purposefully interfered with the Oppermans' application, and that the Board violated State law and intentionally ignored the procedural and substantive provisions of the Ranch Governing Documents in making its decision . . . .[¶] . . . . [¶] . . . .

"8. The Engs objected to the Oppermans' ADU application. They wrote to the Board that if the garage were built it would be inconvenient for them to turn around easily on the Ranch-owned 'Lot G' designed by the Town of Portola Valley and the Ranch's developers for such purpose, without using the Opperman driveway. . . .[¶]

"9. Martin Eng gave the Board two data points: inconvenience in turning his vehicle around, and a past occurrence of contractors blocking his access. Although the proposed project did not affect Lot G, the shared driveway designated by the Town and the Ranch for ingress and egress, the Board took Martin Eng's two data points and decided to reject the Opperman application on that basis, stating that it 'would cause dangers to pedestrians and vehicles and compromise emergency access via Lot G'.

"10. The Board, with no discernable traffic safety expertise or fire expertise and without the benefit of experts, effectively deemed unsafe the Oppermans' building envelope/Lot G for building—a configuration approved by the Town at the Ranch's founding. The Board also found, contrary to the Woodside Fire Protection District (WFPD) emergency vehicle safety requirements, that Lot G was unsafe for emergency access. The Board also

6

ignored the American Association of State Highway and Transportation Officials (AASHTO) standards that show that a vehicle can turn around on Lot G without multiple turns. The Board ignored the fact that Lot G, common area within its control, could simply be reconfigured by adding paving for ease of turning vehicles around. The Board ignored the fact that it is the Ranch's obligation to correct the defects in its property, Lot G, that it deemed reason enough to deny the Oppermans' proposal. . . .[¶] . . . .

"11. In essence, the Board created a theoretical safety construct by inflating two unrelated complaints from an aggrieved neighbor and agreeing that that neighbor, the Engs, had the right to use the Opperman driveway and prohibit the Oppermans from building on it. Then, without expertise and without opinions from experts, it weighed the Oppermans' proposed garage against the Engs' request, and without relying on any technical information or experts, ruled against the Oppermans' garage. The 'safety considerations' were a false premise and excuse for the Board to block an ADU from being built in the Ranch. [¶] . . . [¶]

"15. From a societal perspective, this refusal effectively forces the Oppermans to give up their right to build a garage should they wish to convert their garage to an ADU, an improvement expressly permitted by State law and Town ordinance, and which will make it easier for their adult children to visit/live at the Ranch, allow the Oppermans to age in place much more easily and to generate additional income from a rental. The Board's message was simple and chilling: 'do a garage-to-ADU conversion and we will make you park your cars outside.'

"16. For almost a year the Oppermans have tried—quietly and behind the scenes and despite numerous personal attacks to convince the Board it made a mistake. They engaged in internal dispute resolution, they engaged

7

in mediation, and they provided an alternative configuration.  Still, the Board remains unmoved.  Instead of identifying the basis for its authority, it has steadfastly not done so."

On October 10, the Association filed its answer to the cross-complaint; four days later the Engs filed theirs.

While the litigation was proceeding, the Oppermans submitted a second application for an ADU, a fact virtually overlooked in the briefing.  All that is said about it is this short footnote in the Oppermans' opening brief: "In June 2023, the Oppermans submitted a second application to the Association for an ADU after state law changed to allow ADUs to be placed in front yard setbacks.  The Board approved this application conditioned upon approval by the Town of Portola Valley."

On October 31, 2023, the Association moved for summary judgment. The motion was accompanied by two declarations, of:  (1) Keller, Board President, a 27-paragraph declaration that described in detail the history of the Opperman's application and all that the Board did in dealing with it, also authenticating seven attachments; and (2) Luanne Rutherford, one of the attorneys for the Engs, attaching a portion of the Association guidelines.  The motion was supported by a 10-page memorandum of points and authorities, with the argument portion barely over three pages.  Specifically, following a two-page "Introduction," some three pages of "Statement of Undisputed Material Facts," and a half-page setting forth the "Legal Standard," the memorandum ended with its simple and straightforward argument, with two points:  "A.  The Board Had the Authority to Review the Oppermans' Application" and "B. The Board is Protected From Liability by the Business Judgment Rule."  (Boldface omitted.)

On January 19, 2024, the Oppermans filed their opposition papers.

They included a declaration of Christopher Loweth, an attorney at the firm representing the Oppermans, attached to which were five exhibits; a 14-page memorandum of points and authorities; and 11 pages of evidentiary objections to portions of Keller's declaration, asserting 18 specific objections. The Oppermans' memorandum had five specific arguments: "A. Business Judgment does not Shield Decisions made in Bad Faith"; "B. The Court Should Not Defer to the Association's Interpretation of Governing Documents"; "C. The Court Should Not Defer to the Association's Interpretation of the Text of a Statute"; "D. The Court Should Not Defer to the Association's Interpretation of a Town Ordinance"; and "E. Triable Issues of Material Fact Exist Which Prevent Summary Judgment", the last argument going on to list two claimed questions of fact regarding: (1) "[T]he Association's Purported Reliance on Craig Opperman's ADU Research" and (2) "Whether the Board Acted in Good Faith." (Boldface omitted.)

The Association filed a brief reply, and the motion came on for hearing on March 8, 2024, prior to which the court had entered a tentative ruling granting the motion. At the conclusion of the hearing, the court adopted the tentative ruling as the final order. And on March 19, the court entered a comprehensive, thoughtful eight-page order granting summary judgment. The court also expressly ruled on 10 of the Oppermans' 18 objections to the evidence, adding that "Any objection not specifically ruled on was pursuant to CCP §437c(q)."[1]

---

[1]     Which provides as follows: "In granting or denying a motion for summary judgment or summary adjudication, the court need rule only on those objections to evidence that it deems material to its disposition of the motion. Objections to evidence that are not ruled on for purposes of the motion shall be preserved for appellate review." (Code Civ. Proc., § 437c, subd. (q).)

9

On April 5, the court entered judgment for the Association, from which the Oppermans appealed. This is appeal No. 170737.

The Association filed a memorandum of costs, also seeking attorney fees. On July 12, the court awarded the Association attorney fees of $113,531.50. On September 5, the Oppermans filed a notice of appeal from that award. The court issued an "amended" judgment incorporating the fee and costs award, and the Oppermans amended their second notice of appeal to include this "amended" judgment. This is appeal no. A171745. We ordered the appeals consolidated.[2]

## DISCUSSION

### Summary Judgment Law and the Standard of Review

Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code of Civ. Proc., § 437c, subd. (c).) As applicable here, a moving defendant can meet its burden by demonstrating that "a cause of action has no merit," which it can do by showing that "[o]ne or more of the elements of the cause of action cannot be separately established . . . ." (Code Civ. Proc., § 437c, subd. (o)(1); see also *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 486–487.) Once defendant meets this burden, the burden shifts to plaintiff to show the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2).)

"On appeal '[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. [Citations.]'

---

[2] The Oppermans have filed only one brief, that attacking the summary judgment.

10

(*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate plaintiff's claims. (*Romano v. Rockwell Internat., Inc., supra,* 14 Cal.4th at p. 487.) As we put it in *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320: '[W]e exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit.' (Accord, *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)

" '. . . [W]e accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' [Citation.] And we must ' "view the evidence in the light most favorable to plaintiff[] as the losing part[y]" and "liberally construe plaintiff['s] evidentiary submissions and strictly scrutinize defendant['s] own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiff['s] favor." ' (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97.)" (*Nazir v. United Airlines Inc.* (2009) 178 Cal.App.4th 243, 253–254.)

### The Business Judgment Rule—and the *Lamden* Case

As noted, the Association's motion was based expressly on the "business judgment" rule. The trial court determined that the first substantive issue was "whether the Board's denial of the Oppermans' Application is shielded from liability by the Business Judgment Rule/Judicial Deference doctrine", and the issue is the primary focus of the briefing. We thus begin with a

11

discussion of this law, and the case of *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249 (*Lamden*).

Citing numerous cases and authorities, Witkin describes the business judgment rule as follows: "*Acts Involving Policy or Business Judgment.* The liability of directors for negligence is extremely limited. Where the act or omission involves a question of policy or business judgment, a director cannot be held liable for an erroneous decision or poor choice in the absence of a showing of fraud, bad faith, or negligence." (9 Witkin, Summary of Cal. Law (11th ed. 2025) Corporations, § 112.) The next paragraph adds this: "*Standard of Care.* A director's duties must be performed in good faith, in a manner the director believes to be in the best interests of the corporation and the shareholders, and with the care, including reasonable inquiry, that 'an ordinary prudent person in a like position would use under similar circumstances.' (Corp. C[ode §,] 309[, subd.] (a).)"[3] (*Ibid.*)

As our colleagues in Division Three have put it: "The common law 'business judgment rule' refers to a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions. The business judgment rule is premised on the notion that those to whom the management of the corporation has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is one which is ' ". . . helpful to the conduct of corporate affairs or expedient for the attainment of corporate purposes . . . ," ' and establishes a presumption that directors' decisions are based on sound business judgment. [Citation.] Under this rule, a director is not liable for a mistake in

---

[3]     It has been said that Corporations Code section 309 codifies the "business judgment" rule. (15 Cal.Jur.3d (2025) Corporations, § 268; *Lamden, supra,* 21 Cal.4th at p. 257.)

business judgment which is made in good faith and in what he or she believes to be the best interests of the corporation, where no conflict of interest exists." (*Gaillard v. Natomas Co.* (1989) 208 Cal.App.3d 1250, 1263.)

As we ourselves have described it: " 'The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." [Citation.] A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be "attributed to any rational business purpose." [Citation.]' (*Unocal v. Mesa Petroleum Co.* (Del. Super. Ct. 1985) 493 A.2d 946, 954.)' " (*Katz v. Chevron Corp.* (1994) 22 Cal.App.4th 1352, 1366.)

" ' "[T]he presumption created by the business judgment rule can be rebutted only by affirmative allegations of facts which, if proven, would establish fraud, bad faith, overreaching or an unreasonable failure to investigate material facts." ' " (*Lauckhart v. El Macero Homeowners Assn.* (2023) 92 Cal.App.5th 889, 906; *Eldridge v. Tymshare, Inc.* (1986) 186 Cal.App.3d 767, 776.)

Turning to *Lamden*, it described the setting there, and its holding, in its opening paragraphs: "A building in a condominium development suffered from termite infestation. The board of directors of the development's community association decided to treat the infestation locally ('spot-treat'), rather than fumigate. Alleging the board's decision diminished the value of her unit, the owner of a condominium in the development sued the community association. In adjudicating her claims, under what standard should a court evaluate the board's decision?

"As will appear, we conclude as follows: Where a duly constituted

13

community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts should defer to the board's authority and presumed expertise.  Thus, we adopt today for California courts a rule of judicial deference to community association board decisionmaking that applies, regardless of an association's corporate status, when owners in common interest developments seek to litigate ordinary maintenance decisions entrusted to the discretion of their associations' boards of directors.  (Cf. *Levandusky v. One Fifth Ave. Apt. Corp.* (1990) 75 N.Y.2d 530, 537–538 [554 N.Y.S.2d 807, 811, 557 N.E.2d 1317, 1321] [analogizing a similarly deferential rule to the common law 'business judgment rule'].)

"Accordingly, we reverse the judgment of the Court of Appeal." (*Lamden, supra*, 21 Cal.4th at pp. 252–253.)[4]

*Lamden* noted that "In light of the foregoing, the parties agree the Association is responsible for the repair and maintenance of the Development's common areas occasioned by the presence of termites.  They differ only as to the standard against which the Association's performance in discharging this obligation properly should be assessed: a deferential 'business judgment' standard or a more intrusive one of 'objective reasonableness.' " (*Lamden, supra*, 21 Cal.4th at p. 257.)

*Lamden* then held that the business judgment rule itself would not apply, giving two reasons, the first of which was that "the statutory

---

[4]     The Court of Appeal had held the trial court should have analyzed the association's decision under an objective standard of reasonableness test.

14

protections for individual directors (Corp. Code, §§ 309, subd. (c), 7231, subd. (c)) do not apply, as no individual directors are defendants here." (*Lamden, supra*, 21 Cal.4th at p. 258.) The second reason was that the rule applied to incorporated associations, which La Jolla Shores Clubdominium Homeowners Association was not. (*Id.* at pp. 259–260.)

We digress briefly from discussion of *Lamden* to note that the Association is a corporation. (See *Finley v. Superior Court* (2000) 80 Cal.App.4th 1152, 1161, citing Corp. Code, §§ 309, 7231.) And while the Association is a non-profit entity, the Legislature has made the business judgment rule applicable to nonprofit corporations. (Corp. Code, § 7231.) Thus, it would appear that the business judgment rule applies here, not just by analogy.[5]

Returning to *Lamden*, the Court continued with discussion of numerous cases involving homeowner's associations, especially *Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361 (*Nahrstedt*). And the Court concluded: "Nevertheless, having reviewed the record in this case, and in light of the foregoing authorities, we conclude that the Board's decision here to use secondary, rather than primary, treatment in addressing the Development's termite problem, a matter entrusted to its discretion under the Declaration and Civil Code section 1364, falls within *Nahrstedt*'s pronouncement that 'Generally, courts will uphold decisions made by the governing board of an owners association so long as they represent good faith efforts to further the purposes of the common interest development, are consistent with the development's governing documents, and comply with

---

[5]     As noted, the Association's motion expressly relied on the business judgment rule; and at the hearing, the court said the business judgment rule is the "whole point of the motion."

15

public policy.' [Citation.] Moreover, our deferring to the Board's discretion in this matter, which, as previously noted, is broadly conferred in the Development's CC&R's, is consistent with *Nahrstedt*'s holding that CC&R's 'should be enforced unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit.' [Citation.]" (*Lamden*, *supra*, 21 Cal.4th at pp. 264– 265.)

Against that background, we turn to the arguments in the Oppermans' appeal—and conclude that none has merit.

**The Summary Judgment Was Proper**

<u>**The Board Acted Properly**</u>

Following their setting forth of the standard of review, the Oppermans make four arguments, labeled III through VI. The first argument, III, is that "The CC&Rs limit the Association's project review to aesthetics. The board did not base its rejection of the Opperman application on aesthetic grounds." (Boldface omitted.) The argument begins as follows: "The Association, acting through the Board, denied Oppermans' application based on 'concerns about traffic and fire safety with the proposed new garage.' Nothing in the CC&Rs or the Design Guidelines adopted pursuant to the CC&Rs authorize the Association to review projects on these bases."

While that is how the argument reads, buried deep in the argument is a passage that indicates that the Board could not act at all in the circumstances here. That is, citing one subdivision in Section 10 of the CC&Rs—but no legal authority—five pages into the argument the brief says this: "The CC&Rs authorized the Board to act in lieu of the Design Committee only if no design committee existed. 'If, for any reason, no Design Committee exists, the Board shall act as the Design Committee and all

16

applicable references herein to the Design Committee shall be references to the Board acting as the Design Committee.' (§ 10.02, subd. (c))  But the Design Committee *did* exist.  When it abdicated its 'duty' 'to consider and act upon any and all proposals,', the Board's only options were to appoint a new committee or allow the application to be approved by operation of law—per the applicable CC&R provision, section 10.04."

While that statement here contains no authority supporting it, an argument along those lines was made below—and was rejected by the court with this thorough analysis:

"The issue of whether the Board could act in the Design Committee's ('DC') place is a contract interpretation question of law for the Court. *McCrary Construction Company v. Metal Deck Specialists, Inc.* (2005) 133 Cal.App.4th 1528, 1536.  The Oppermans agree.  The facts are not in dispute: the DC refused to act and expressly deferred to the Board to review all ADU applications.  The parties' disagreement depends upon the interpretation of Article 10, section 10.02(c), of the . . . Covenants, Conditions and Restrictions of Portola Ranch Planned Development ('CC&Rs'), which states:

"(c)  If, for any reason, **no Design Committee** exists, the Board shall act as the Design Committee and all applicable references herein to the Design Committee shall be references to the Board acting as the Design Committee.  If no Design Committee exists and the Board is acting as the Design Committee, there shall be no reconsideration as provided for in Section 10.04.  If the Board is functioning as the Committee or if a meeting of the Committee will include sitting directors of the Board, such meetings of the Committee where the number of directors in attendance at the Committee meeting would constitute a quorum for a meeting of the Board shall be noticed and otherwise conducted pursuant to Article 7 of the Bylaws.

17

[¶]

"The HOA interprets this as allowing the Board to act in the DC's stead once they refused to do so. The Oppermans take a more literal approach, *i.e.* since the DC still literally and technically 'existed' this provision does not allow the Board to act in their stead and, apparently, the only solution is to wait until the DC decides to act again. The Court must therefore interpret the meaning of 'exist' and how it applies to these circumstances. *Foxcroft Productions, Inc. v. Universal City Studios, LLC* (2022) 76 Cal.App.5th 1119, 1130. The Court finds the HOA interpretation reasonable. The Oppermans' interpretation, taken to its logical conclusion, would mean the HOA was paralyzed and unable to act in this context and that no homeowner could submit an application until the impasse ended. That interpretation is unreasonable in light of the language in ¶10.02(c) as well as ¶7.03.1 ('The Board shall have the power . . . to enforce' the 'Governing Documents (including Design Guidelines . . . ')), and ¶10.12 ('The Board, on its own initiative . . . may review and reverse or modify any action of the Design Committee . . .'). Thus, the CC&Rs, *i.e.* the contract between the parties, grants the Board broad powers to review and overrule the subservient DC. Accordingly, if the DC should 'decline to review any application for an ADU' and explicitly 'refer all ADU applications to the full Board for review' the only reasonable interpretation of the CC&Rs is that the Board is within its authority to assume that responsibility."

We agree. Regardless, the Oppermans offer nothing supporting their conclusory statement, and thus it cannot avail them, as our " 'review is limited to issues that "have been adequately raised and briefed." ' " (*Claudio v. Regents of the Univ. of California* (2005) 134 Cal.App.4th 224, 230, quoting *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116.)

18

Returning back to the Oppermans' essential argument, it is based on a section in Section 10 of the CC&Rs entitled, "Design Control" and "[t]he Design Guidelines[ ] adopted April 21, 2021."[6] And citing Sections 1.1 and 1.1.5 of the Design Guidelines, the Oppermans assert that "any review by the Design Committee is for aesthetics only."[7]

But there is more to the analysis than that. As the trial court noted, the argument fails to acknowledge that the Board was not just acting as the Design Committee, but also as the Board. And this brings into play various other provisions in the governing documents, including these:

Section 6.02: "The affairs of the Association shall be managed and governed by the Board, who shall have all the powers and duties set forth in this Declaration, the Articles, the Bylaws, the Act and the Nonprofit Corporation Law."

---

[6] The "Design Guidelines" and the "Fire Risk Management Guidelines" are part of the "Operating Rules" of the Association.

[7] Section 1.1.1. provides: "Design Guidelines set forth the standards that govern the appearance of construction, modification and maintenance of residences at Portola Valley Ranch. These Design Guidelines also fulfill an obligation to the Town of Portola Valley to ensure that the visual aspects of the Ranch are maintained in accordance with the standards established by the Town when the Ranch development was approved."

Section 1.5 provides: "The Design Guidelines are only concerned with visual and aesthetic aspects of the Ranch and thus do not include home interiors. They do not address structural/engineering elements, except when those elements impact the visual aesthetics of the Ranch. The homeowner must rely on his or her own experts for structural/engineering standards. Similarly, the Guidelines do not address security and safety issues except when impacting Ranch design aesthetics. In both of these situations the Design Guidelines provide accommodation between the necessary structural/engineering aspects, the necessary security/safety aspects and acceptable visual and aesthetic designs."

19

And 7.01, which identifies the "duties and powers" of the Association, highlighting the need to promote the "safety and welfare of all Owners" through "rules, regulations, policies, and guidelines."

And Section 7.02.1, that the Board "shall enforce and carry out the provisions of the Governing Documents . . . and adopt policies of the Association which shall consist of such Operating Rules of the Association that fulfill the purposes of the Association." Thus, for example, the Association "shall be responsible for fire risk management of Common Areas in accordance with the Fire Risk Management Guidelines."

And Sections 7.03 and 7.03.1, which, reiterating the Association's authority to exercise the power allowed under the Nonprofit Corporation Law, amplify that the Association has "the power to do any and all lawful things that may be authorized, required or permitted to be done by the Association under the Governing Documents and the Act, and to do and perform any and all acts that may be necessary or proper for or incidental to the exercise of any of the express powers of the Association." Additionally, the Board has "the power to commence and maintain actions and suits in the name of the Association . . . to restrain and enjoin any breach or threatened breach of the Governing Documents (including the Design Guidelines, the Design Committee Procedures, the Fire Risk Management Guidelines), the Act and the Nonprofit Corporation Law, and to enforce, by mandatory injunction or otherwise, all of the provisions thereof . . . ."

And Section 7.03.9(a), which provides that the Board's "power to adopt and enforce Operating Rules of the Association applies to all aspects of this Declaration, whether or not "a particular section [t]herein authorizes such adoption and enforcement."

Beyond all that, there is Civil Code section 4765, entitled

"Architectural Review and Decision Making." Section 4765 provides in pertinent part that "Notwithstanding a contrary provision of the governing documents, a decision on a proposed change may not violate any governing provision of law . . . or a building code or other applicable law governing land use or public safety." (Civ. Code, § 4765, subd. (a)(3).)

In sum and in short, the Board acted well within the governing documents—and the law.

### *Lamden* **Has Broad Application—And Applies Here**

The Oppermans' second argument, IV, is that "[t]he Association is not protected by the *Lamden* rule in interpreting CC&Rs of applicable building codes and regulations." (Boldface omitted.) Citing to *Affan v. Portofino Cove Homeowners Assn.* (2010) 189 Cal.App.4th 930, 940 (*Affan*), the Oppermans assert it is "important to note the narrow scope of the *Lamden* rule," claiming "that the rule of deference applies only when a homeowner sues an association over a maintenance decision." The law is otherwise.

*Eith v. Ketelhut* (2018) 31 Cal.App.5th 1 (*Eith*) is illustrative. The issue there was whether defendants' cultivation of a vineyard violated a provision in the CC&Rs. The trial court applied the judicial deference rule in *Lamden*, and the Court of Appeal affirmed, with a comprehensive discussion of the cases. (*Eith, supra*, 31 Cal.App.5th at pp. 15–18.) Specifically, after citing two cases for the proposition that "[s]ome courts have narrowly construed the *Lamden* rule,"[8] the Court of Appeal said that "[m]ost courts have broadly construed the *Lamden* rule," going on to discuss *Lamden* and four other cases: *Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863

---

[8] Citing *Affan, supra*, 189 Cal.App.4th 930 and *Ritter & Ritter, Inc. Pension and Profit Plan v. The Churchill Condominium Assn.* (2008) 166 Cal.App.4th 103.

(*Haley*); *Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809 (*Harvey*); *Watts v. Oak Shores Community Association* (2015) 235 Cal.App.4th 466 (*Watts*); and *Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965 (*Dolan-King*).  (*Eith*, at pp. 15–17.)

Eith concluded as follows:  "Based on *Lamden*, *Haley*, *Harvey*, *Watts*, and *Dolan-King*, the judicial deference rule applies to an association board's *discretionary* decisions concerning the operation of the common interest development, e.g., the board's maintenance and repair decisions (*Lamden*), its selection of the appropriate means to remedy a violation of the CC&Rs (*Haley*), its designation of storage space in a common area (*Harvey*), its adoption of rules relating to short-term rentals (*Watts*), or its approval or rejection of a homeowner's improvement plan (*Dolan-King*).  As we observed in *Watts*, 'Common interest developments are best operated by the board of directors, not the courts.'  (*Watts*, *supra*, 235 Cal.App.4th at p. 473.)"  (*Eith*, *supra*, 31 Cal.App.5th at p. 16.)

The practice guides involving homeowners associations also state that *Lamden* is broadly read.  For example, the guide entitled, "Forming California Common Interest Developments" says:  "The judicial deference standard has been expanded to apply to any board decision made in good faith to further the purpose of the development (not just maintenance and repair issues), as long as the decision is consistent with the governing documents and public policy."  (Bruce et al., Forming California Common Interest Developments (Cont.Ed.Bar 2024) § 8.26.)  And that entitled "Advising California Common Interest Communities" is similar.  It states: "Courts have applied the *Lamden* doctrine of judicial deference to corporate actions other than maintenance decisions."  (Howell at al., Advising California Common Interest Communities (Cont.Ed.Bar. 2d ed. 2025) § 4.15.)

22

### The Association Met Its Burden:  The Evidence Was Sufficient

As noted, the Association's moving papers included a detailed, comprehensive declaration of Keller describing all that occurred in connection with the Oppermans' application, including what the Board had before it leading to its decision, a declaration that with its attachments was almost sixty pages.  Eschewing any reference to that, the Oppermans make their third and fourth arguments, labeled V and VI, which read as follows:  "V. The Association needed to present evidence that would require a jury to find it had acted in good faith.  It failed to do so"; and "VI.  Stripped of hearsay and irrelevancies, the Association's evidence fails to sustain its burden on the motion."[9]

The third argument begins with the sentence that "*Lamden* deference to association decisions is in the nature of an affirmative defense.  (*Ekstrom* [*v. Marquesa at Monarch Beach Homeowners Assn.* (2008)] 168 Cal.App.4th [1111,] 1123 [(*Ekstrom*)].)"  Passing over what it means to be "in the nature of an affirmative defense," we note that the Oppermans did not make the argument below.  It has no place here.

As we recently confirmed in *Doe WHBE 3 v. Uber Technologies, Inc.* (2024) 102 Cal.App.5th 1135, 1152:  "It is well settled . . . ' "that issues not raised in the trial court cannot be raised for the first time on appeal. [Citations.]' [Citations.]"  (See generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2024) ¶ 8:229.)  The rule is " ' "based on fairness—it would be unfair, both to the trial court and the

---

[9]     The fourth argument is hardly an argument on its own, as it essentially reasserts their evidentiary objections made below that, as noted, the trial court overruled.

opposing litigants, to permit a change of theory on appeal." [Citation.]' " (*Hewlett Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548.)

In any event, the argument has no merit.

As noted, *Lamden* held that the judicial deference rule applies "to community association board decisionmaking that would apply, regardless of an association's corporate status, when owners in common interest developments seek to litigate ordinary maintenance decisions entrusted to the discretion of their associations' boards of directors." (*Lamden*, *supra*, 21 Cal.4th at p. 260.) And there is no reference anywhere in the opinion to any affirmative defense. Rather, the case sets forth a judicial standard for reviewing the discretionary decisions of homeowners' associations, stating that "we adopt for California courts a rule . . . of judicial deference to community association board decisionmaking" (*ibid.*) and "[t]he formulation we have articulated affords homeowners, community associations, courts and advocates a clear standard for judicial review of discretionary economic decisions by community association boards." (*Id.* at p. 270.)

As the analogous business judgment rule—upon which *Lamden* is modeled, and which, as noted, may itself apply here—describes, it "sets up a presumption that directors' decisions are made in good faith." (*Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 136.) Or as we put it in *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1045 (*Berg & Berg*), it "establishes a presumption that directors' decisions are based on sound business judgment." "[T]he presumption created by the business judgment rule can be rebutted only by affirmative allegations of facts which, if proven, would establish fraud, bad faith, overreaching or an unreasonable failure to investigate material facts." (*Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 715 (*Lee*); accord,

24

*Berg & Berg*, *supra*, 178 Cal.App.4th at p. 1045 ["a plaintiff must allege sufficient facts to establish these exceptions" to the business judgment rule]; Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2025) ¶ 6:245.1 ["a plaintiff challenging the board decision has the burden of showing the decision involved a conflict of interest, or was made in bad faith . . . .], italics omitted].)[10]

The argument does not accuse the Board of "fraud" or "overreaching" or an "unreasonable failure to investigate" or a "conflict of interest." Rather, the argument refers to the Board president Keller's declaration, which, the argument asserts, "viewed strictly as summary judgment practice requires, raises an inference of bad faith." Elaborating, the argument claims that the declaration is replete with hearsay; contains "multiple irrelevant statements about the Oppermans that reveal Keller's and the Board's antagonism" toward them; points to the Board's claimed failure to advise the Oppermans of a site inspection and a consultation with a traffic engineer; and mentions claimed "post-application irrelevancies." And, the argument asserts, "At best, the Keller Declaration creates conflicting references concern[ing] the Association's good faith."

We disagree. But before explaining why, we briefly discuss the Oppermans' claims of hearsay, beginning with the observation that, given their entire argument is based on content in Keller's declaration, we fail to see the efficacy in any argument to exclude the evidence. In any event, the hearsay claim—as noted, the essence of the Oppermans' fourth argument (see

---

[10]    Other words used to describe bad faith include "arbitrariness, favoritism, discrimination, and malice." (1 Knepper & Bailey, Liability of Corporate Officers & Directors (Matthew Bender 2025) § 2:08; see also *Dolan-King*, *supra*, 81 Cal.App.4th at p. 979 [good faith equated with " 'not in an arbitrary or capricious manner' "].)

*ante*, footnote 9)—has no merit.

By way of brief recap, the Oppermans asserted 18 objections to Keller's declaration. The trial court expressly ruled on 10 of them, further noting that it did not rule on the others pursuant to Code of Civil Procedure section 437c, subdivision (q) as not material. And the trial court overruled all 10, with these explanations:

"No. 5: OVERRULED. The beginning phrase is undisputed at UMF 10. The portion that reads: 'in light of the Design Committee's refusal to review ADU applications' can be reasonably inferred from UMF 8 and the fact that Keller was on the Board during this process, albeit not technically at that time, and the undisputed fact that the Board ruled on the Application after receiving the deferral from the Design Committee. The last phrase regarding the Oppermans' alleged refusal is irrelevant.

"Nos. 6-9: OVERRULED. The Oppermans have not shown that Keller lacks personal knowledge about the Oppermans' Application and the subsequent investigation since Craig Opperman acknowledges Keller started serving in November 2021. Keller also states that he was Board President when the Application was denied.

"Nos. 10-12 (Keller Decl. ¶¶ 18, 19, 21): OVERRULED. See UMFs 15-17, with the Court taking note that Maston said he would 'leave it to the Board' re whether the Application was complete in UMF 16.

"Nos. 15-17: OVERRULED."

The Oppermans have demonstrated no error in those rulings.

Returning to the Oppermans' sole contention of "conflicting inferences," the observation by Justice Croskey in the leading case of *Lee, supra,* 50 Cal.App.4th at p. 717 is apt: "it is the very essence of the business judgment rule that, where a reasonable business purpose is asserted, the motives of

26

directors will not be scrutinized, absent a basis for overcoming the presumption of good faith embodied by the business judgment rule." (Accord, 1 Knepper & Bailey, Liability of Corporate Officers & Directors, *supra*, § 2:10.) The Oppermans have demonstrated no such basis here.

We begin with some foundational rules governing the requirements for parties opposing a motion for summary judgment. (See generally Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2025) ¶ 10:188 et seq.).) They include that the opposing party must produce evidence showing some triable issue of material fact (Code Civ. Proc., § 437c, subd. (b)(3)), with evidence that must be substantial. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 166; *Uhrich v. State Farm Fire & Casualty Co.* (2003) 109 Cal.App.4th 598, 616.) The opposition cannot be based on "speculation, imagination, guesswork, or mere possibilities." (*Doe v. Salesian Society* (2008) 159 Cal.App.4th 474, 481.) As we ourselves put it in *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807, " 'To avoid summary judgment, [appellant] "must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses." [Citation.] [He] must produce "specific, substantial evidence . . . ." [Citation.]' [Citation.] We emphasize that an issue of fact can only be created by a conflict of evidence. It is not created by speculation or conjecture."

There is nothing but speculation here, as the trial court aptly noted: "the undisputed evidence fails to establish anything other than a disagreement between the parties that does not rise to the level of bad faith. For example, the 'erroneous measurement of fire separation distance,' Maston's memos and dealings with Bullard, and Rodriguez's opinion that a car could turn around in Lot G without encroaching on the Opperman[s'] property do not create any triable issue of material fact of fraud, bad faith,

27

overreaching or an unreasonable failure to investigate material facts. Rather, they are conclusory allegations of improper motives and conflict of interest. The Board's denial letter sets forth sound business judgment as a matter of law and the Oppermans do not thereafter meet their burden to show that a triable issue of one or more material facts exists as to that defense to all causes of action."

Not only have the Oppermans failed to show bad faith, a reading of the record indicates that the Association acted in good faith, manifested by two significant points: first, before denying the application, it asked the Oppermans to split the application, and twice they refused; and second, in June 2023, while in the midst of the lawsuit by the Oppermans, the Association approved their later application for an ADU.

As the trial court aptly summed it up in the penultimate section of its order: "Both sides acknowledge a long, drawn out negotiation on this issue. It is undisputed that the HOA attempted compromise by asking the Oppermans to resubmit the Application without the garage aspect and that, despite their differences, the HOA ultimately approved a second ADU project for the Oppermans, on which they have begun construction. The root of the Oppermans' frustrations are understandable—they want to build on their property and firmly believe their Application complied with the CC&Rs. But, at the end of the day, the Oppermans simply did not get their way with the HOA."

As *Lamden* observed, " 'anyone who buys a unit in a common interest development with knowledge of its owners association's discretionary power accepts 'the risk that the power may be used in a way that benefits the commonality but harms the individual.' " (*Lamden, supra*, 21 Cal.4th at p. 269.) Or as the Court later put it, in such cases judicial deference "is

28

appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments to make the detailed and peculiar economic decisions necessary in the maintenance of those developments." (*Id.* at p. 271.)

The Oppermans' approach is 180-degrees contrary, focusing only on their claimed rights. Again, *Lamden* is apt: "To permit one owner to impose her will on all others and in contravention of the governing board's good faith decision would turn the principle of benefit to ' "the commonality but harm[ to] the individual" ' . . . on its head." (*Lamden, supra,* 21 Cal.4th at p. 270, fn. 10; to the same effect see *Nahrstedt, supra,* 8 Cal.4th at p. 386 ["the reasonableness or unreasonableness of a condominium use restriction . . . is to be determined not by reference to facts that are specific to the objecting homeowner, but by reference to the common interest development as a whole"]; and *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 653 ["No decision of the Committee could possibly be deemed 'arbitrary' as to an individual homeowner if it were based upon a superseding duty to the community at large"].)

The Oppermans have not filed a separate brief on the attorney fee award, its brief acknowledging they do "not challenge the entitlement to or amount of the fees per se" and asserting that they "fall with the judgment." The judgment has not fallen. The fee award stands.

## DISPOSITION

The judgments are affirmed. The Association shall recover its costs on appeal.

29

_____

                    RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

DESAUTELS, J.

(A170737N, A171745N)

30

Filed 12/22/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARTIN ENG, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CRAIG OPPERMAN, et al. <br><br> Defendants, Cross-Complainants, and Appellants; <br><br><br> PORTOLA RANCH ASSOCIATION, INC., <br><br> Cross-defendant and Respondent. | A170737, A171745 <br><br> (San Mateo County Super. Ct. No. 21CIV06544) <br><br><br><br> ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter, filed on December 19, 2025, was not certified for publication in the Official Reports. After the court's review under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated: _____

Stewart, P. J.

1

Superior Court of San Mateo County

Hon. Jeffrey Finigan, Judge

Counsel:

Law Office of A. Charles Dell'Ario, Alan Charles Dell'Ario for Defendants, Cross-Complainants and Appellants.


Wilson, Elser, Moskowitz, Edelman & Dicker, Luanne Rutherford and Robert Cooper for Cross-Defendant and Respondent.